Let's take up the next case, Senate 10, Porter v. Pennymac Loan Services, LLC. Argument for the appellant. In the police court, my name is Darrell Dunham. I'm representing the plaintiff, Appellant Travis Porter. As you know, this is a dispute between my client, Pennymac, a mortgage loan servicing entity. And there's basically two views of what has been pled in the complaint. We're up here on a 2-6-19 motion where the complaint was dismissed with prejudice. The Pennymac view is that this is just a dispute about how much is owed on an escrow account. That Pennymac adequately informed Mr. Porter and his attorney, that is me, of what the escrow balance was. And certainly there wasn't any violation of either contractually or certainly not under the Consumer Fraud and Assessing Trade Practices Act. That's the Pennymac view. Our view is that when you look at the complaint, when you look at all the exhibits, what we have is what I believe what we pled was an oppressing tactic by Pennymac to coerce Mr. Porter into paying more than what was legitimately due in terms of the note and the mortgage. And they not only did that, but they declared a default, they accelerated the debt, fouled my client's credit, forced him to refinance at unfavorable interest rates, additional rates because of this issue and problem with his credit, caused by Pennymac. Do you agree that Pennymac complied with RESPA? No. So is part of your claim that they violated RESPA? We are not doing, no. Your Honor, we're not doing this claim under RESPA. To my knowledge, I don't think that under RESPA you have an implied cause of action in the federal law or any other law. What we are claiming is that RESPA, obviously Pennymac claims that RESPA provides a safe harbor for anything and everything you bid. Our contention is, and Pennymac hasn't been able to cite any authority, that RESPA does not permit Pennymac to demand that my client pay more than what the terms of the note and mortgage require. And that's exactly what Pennymac endeavored to do. Okay, let me just ask, the note and mortgage do provide for escrowing for taxes and insurance, right? No question about it. Yeah, and that can be changed, and under RESPA they're supposed to give a notice first of the year, and they point to pages C, 53 and 54 of the record, which is in the appendix, your appendix at 49 and 50, which does appear that they sent a notice that said, you know, we haven't collected enough, and it's a notice of, and we're projecting this amount, and you have to pay it. Let's then turn to page A49, A50 of the record, because I knew I was going to have to go there. Okay. We know that Pennymac, throughout the correspondence back and forth, was claiming that the total payment needed to be raised from $1,227 to $1,565.35. Now, if you look at page 49 and 50, nowhere in there does Pennymac expressly say that when this $1,565.35 is going to drop back to a lower number. Now, it does say they can amortize or prioritize this over 12 months, but I wrote, by my count, five certified letters asking for an accounting, asking, how do you get the $1,565? How much is the criminal principle? How much is the criminal interest? How much are the taxes? How much for insurance or any other amount? And I never got a definitive answer to that question until, and this is the point that the trial judge, for whatever reason, didn't want to deal with, and certainly Pennymac doesn't want to deal with, because if you turn to A64 and 65 of the record, Your Honor, we finally get, and we started this basically in January of 2013, where my client, it's really kind of a plaintiff kind of fax, handwritten fax, saying, please give me a detailed accounting as to how you're getting to these numbers. Now, this is the first time, in my opinion, where there's any kind of statement given. And they do say, apparently, although there's an issue with mortgage insurance that I'm going to, if I have time, Your Honor, I'd like to raise, because in their earlier correspondence they are asking that they attribute $174.39 to mortgage insurance. Now, if you look at the HUD statement, it has nothing, no provision in there, the closing statement for mortgage insurance. But for some reason, later on in their May correspondence and subsequent correspondence, they're tacking on this $174.39. But in July of 2013, no mention of mortgage insurance. And they get to the nub of the matter, which is something that I suspected, and I wrote in a prior letter, that when they closed, they didn't realize that there were two mortgage tax payments that were due in the state of Illinois. Now, they get the months wrong, but they were right. And apparently, they escrowed at the time of the closing, they only escrowed the first mortgage payment, I say tax payment, of $1,858.40. Okay. So that's the discrepancy. Although, earlier on, Your Honor, they keep mentioning mortgage insurance. And I'd still like to know whether they believe, at any point in time, truly believe that my client owed mortgage insurance. But let's move to the next page, because this is the crux of the point. This is what the trial judge, for whatever reason, doesn't want, didn't want to deal with, and Penny Mac doesn't want to deal with. And here's what the letter says. As of the date of this letter, Mr. Porter's account is currently due for June 1, 2013, payment in the amount of $1,565.35. We know that amount. And all subsequent mortgage payments. Well, aren't they required by RESPA to annually, at the beginning of the year, or whenever, reassess that? Well, I don't know whether they are or they're not. What I am saying is, because this is not a suit under RESPA, there's only one way that I can read all subsequent mortgage payments. And that is, this is a 30-year loan, and if he has to make payments of $1,565.35 for the life of the loan, he's going to be paying a minimum of $60,000 more than he's required to pay under the noted mortgage. However, if real estate taxes go up like they tend to do every year, it might be a bargain for him. Yes, and they would be entitled, if the real estate taxes go up, to make an assessment. Now, sometimes, particularly in Jackson County, where about half the population there is protesting their taxes, Justice Stewart and I live in the same neighborhood, so he can probably relate. He has a lot of home there, so he can probably relate to what I'm saying. A lot of the real estate taxes are going down. But if they're going down, then he, Mr. Porter, is going to get at the benefit of that assumption as well. But I don't see how you can read that language anything other than what it means. And, frankly, when Mr. Porter came in here and said, given the objective behavior of these folks, we have to assume that you've got a choice here. Certainly, you can't pay this mortgage more. You've got to mitigate your damages. You've got to repayments. Because these people have given every intention that they've told you that they are going to charge you 15, 65, 35, all subsequent mortgage payments. It doesn't say all subsequent mortgage payments until the end of the year, when they reevaluate. And here's a question that I've been trying. If you look at all the letters I wrote, I said, okay, if you look, Your Honor, at page A57 of the record, I write the letter and say, okay, if the problem is because you only accepted one installment, right, you only asked for one installment, then by my calculations it comes up to $1,388 for the mortgage and insurance, and then if you add the other installment in. Second to last paragraph there, Your Honor. But then I also ask, I need to know whether you guys are charging mortgage insurance or not. Now, one of the questions I like to have answered, because it's never been answered, at what point, if their theory really is that what they were planning on doing was reassessing, looking at the escrow account in a year or six months or whatever it was, make a new calculation, and given their present assumptions, when does the 15, 65 and change drop down to $1,388? When? Because I've been asking for this kind of information for the better part of six months, never got it. And let me suggest that we're still not going to have the answer. And were they charging, in terms of this 15, 65 and cents, were they charging mortgage insurance or not? Because I asked that question on July 22, 2013, and never got an answer to it. And if the point is in the letter at page 64 and 65, where they say that it's going to be, at the end, figure out the life of the mortgage, doesn't say it's going to stop in one year, and it mentions nothing about mortgage insurance. That you go back, Your Honor, to page A, index page A31, there they're charging $174.39 for mortgage insurance. So my point is, I think what has happened here is I don't know, and we're here on a motion, 2619 motion to dismiss, but I'd like to take the deposition of Ms. Verver, if I'm pronouncing that right, the lady that signed this letter, page A65 of the appendix, and say, okay, how did you come up with this number? Was the mortgage insurance involved there or not? Did you really mean it when you say all subsequent mortgage payments? If you didn't mean it, of course, she's going to be crap, but she has some explaining to do why I can't take, why my client can't take that literally. Why in the world couldn't, at some point in time, somebody at Pennymax simply said, you're going to have to pay $15, $65, $35 for so many months, 12 months, 10 months, 9 months, whatever it is, at which point in time, assuming the taxes don't go up, your insurance doesn't go back, where your payment is going to drop down to $1,388. Never got that information. Asked for it repeatedly. And instead of giving Mr. Porter that information, what does Pennymax do? They send out a notice of default. They accelerate the debt. Meanwhile, every month, my client has been making his payments under the closing statement, as he was directed to do at the time of the closing. So he's making the payments. Every month, every month, we're doing it by certified letter to make sure that nobody's going to claim that they didn't hear. And he's making his payments. What do these folks do? They declare default, accelerate the debt, foul his credit, and now he asks that he's in a position where he's forced to refinance at significantly higher interest rates. Case law in the state of Illinois does indicate, if you are in an oppressive way or making demands, threatening to collect debts that's not due and owing, you violated the act. And that's exactly what Pennymax has done here. There's no other way, Your Honor, to read that letter. I understand Pennymax is going to get up here and say, well, you have to assume that Pennymax is going to recalculate at some point in time in the future and the 156535 will be reduced. But that's not what the letter says. In fact, I think, Your Honor, I don't know. I think when this lady wrote this, I think that's what she truly believed because I don't think she cared or understood or maybe, in fact, I think that's really what she believed when she analyzed the paperwork. And she was expecting my client to pay $1565.35 throughout the life of this loan, which means he's going to wind up paying a minimum of $60,000 more than what he was required to pay over the life of the loan. We're talking about real money here. We're talking about money that my client really could not afford to pay. And that's why he was forced in the situation that he was. Any further questions? Thank you, counsel. Argument on behalf of the athlete. Thank you. Good morning. Penny Mack did nothing wrong. Penny Mack serviced Porter's mortgage loan in compliance with all the numerous consumer protection statutes applicable to mortgage loan servicing. This case stems from Porter's and Porter's counsel's refusal to accept the fact that Porter is responsible for paying the property taxes on his personal residence. As counsel indicated, Jackson County taxes are paid in two semi-annual installments. Here, the original lender, American Equity Mortgage, only collected funds for a single tax payment for Porter's loan. Servicing for the loan that eventually transferred to Penny Mack, and upon that transfer, Penny Mack conducted an annual escrow analysis, a routine procedure that is always done in such an event. As a result of American Equity Mortgage's failure to collect two tax installments at the loan closing, Penny Mack's analysis revealed that there was an escrow shortage, and that the amount in Porter's escrow account was insufficient to cover Porter's taxes, insurance premiums, mortgage insurance, and the federally established one-sixth cushion pursuant to RESPA. Therefore, pursuant to RESPA, Porter's escrow payment was increased to ensure that the escrow account would have sufficient funds. The trial court reviewed Penny Mack's escrow analysis, found that the numbers were correct, complied with RESPA to the pen, and as a result, Porter's claim should be dismissed with prejudice. Such an analysis and ruling is perfectly appropriate in I-2619, Motion to Dismiss, and that ruling should be affirmed. Porter's claim was based on his misunderstanding for why his escrow payment was increased. Porter's complaint alleges that Penny Mack had incorrectly claimed that Porter's taxes had increased, and this justified an increase in the escrow payment. However, Penny Mack never claimed that Porter's property taxes increased. It merely clarified that the original lender had only collected a single tax payment, and therefore, there was a shortage in the escrow account, and Porter's escrow payment needed to be increased to make up for the shortage so as taxes could be paid. Changes made to Porter's monthly payment were made pursuant to RESPA's requirements and the requirements of Regulation X. Porter was promptly notified of these changes via his annual escrow account disclosure statement, which specifies that the analysis was an annual analysis pursuant to RESPA. Accordingly, any change made to Porter's escrow payment was only effective for 12 months until the next annual analysis would be conducted. In fact, the disclosure statement states that the total shortage of $2,127.66 would be collected over 12 months, and that Porter had the option of paying the entire thing in one lump sum. There is nothing in the disclosure statement that indicates there is a permanent change. Moreover, the July 22 letter, which we just heard a lot about, included a copy of that disclosure statement. It specifies that the reasons for the payment increase were the result of the necessary increase to the escrow payment to cover the taxes. It states that the loan is due for the June 1 payment and all subsequent payments. And it also states that the June payment is $1,565.35. It does not say that all subsequent payments will be in the amount of $1,565.35. Paymax actions, as established by Porter's own exhibits to his complaint, complied with and were mandated by RESPA. As a result, pursuant to RESPA's own state harbor—I'm sorry, pursuant to ICFA's state harbor, Porter cannot maintain a claim under ICFA. Even if Paymax had earned its calculation of Porter's escrow account, there is no private right of retirement under RESPA, and therefore no claim under ICFA as well. It is clear that Porter's ICFA claim is premised on his belief that Paymax incorrectly managed his escrow account. The management of an escrow account is regulated by Section 2609 of RESPA, and the fact that Porter's complaint does not cite or even reference RESPA is immaterial, because the actions complained of, the management or mismanagement of an escrow account, are actions that are regulated by RESPA. RESPA does not provide for a private right of action related to escrow account management, and accordingly, Porter cannot circumvent that lack of a private right of action by bringing a claim under ICFA. And finally, even if Paymax had mismanaged its escrow account, and even if there was some sort of private right of action based on such mismanagement, Porter could still not maintain an ICFA claim, because an ICFA claim cannot be based on nothing more than a contractual dispute. The management of the escrow account is governed by the term Porter's mortgage, and Porter's reply brief in this court makes clear that this is a dispute about the amount of money Paymax is entitled to charge Porter under the note in mortgage. There is an overwhelming amount of case I'll say between the contractual disputes like this one cannot form the basis of an ICFA claim. As a result, for those three reasons, the trial court was correct in dismissing Porter's complaint with prejudice pursuant to Section 2619. As for counsel's questions regarding mortgage insurance, the record is very clear that he contracted for mortgage insurance at the time of the loan closing. C-12 in the record, C-28, and C-29 are all documents that establish that the mortgage insurance was a contractual term set out in the note in mortgage. Additionally, any claims regarding the amount of money that was going to be requested going forward can all be resolved in the disclosure statement, where the calculations are clearly and unequivocally set forth. In fact, the trial court went through the disclosure statements and found that those calculations were all correct. As a result, that decision should be affirmed. If I have any time, I'd be happy to take any questions. If we have any questions, thank you, counsel. Rebuttal? Yes, Your Honor. Now, is it incorrect that he did contract or didn't contract for mortgage insurance? I thought that was one of your arguments. Your Honor, if you look at the terms of the mortgage, it does say under the stated circumstances that the mortgagee can require mortgage insurance. But if you will turn to A-33 of the record, which is the original HUD closing statement, line 1003, there's no premium in there for mortgage insurance. So certainly the original mortgagee under this obligation did not require mortgage insurance. If you will look at my letter where I made a demand and said, if in this 1565 you got mortgage insurance, give me a copy of the policy, what is the premium amount, what's the extent of coverage, all of that stuff. Yeah, just a minute though. A-33, that's part of the settlement statement when he got the mortgage. Exactly. And there wouldn't have been any mortgage insurance due then because it would go forward from the time you don't pay mortgage insurance on a mortgage that doesn't exist yet. Your Honor, the way I read the HUD closing statement. I mean, this is what had to come out of the loan or what he had to pay at the time of closing. They require a certain amount as they did for one future tax payment. They required an escrow. They required an escrow for also another for the insurance. It doesn't add up, Your Honor. The only way you can get to 1565 at all, because if you add 174.39 into the $1,388, which is my calculation, which Penny Mac agreed to in the trial court, you do not get 1565. I think this is a factual issue that needs to be fleshed out. But when we add the numbers together, I do not believe that they were charging for mortgage insurance, although their earlier correspondence indicated that they were. This is a 2619 motion. Porter gets the benefit of all inferences, all presumptions. Nobody, either the trial judge or Porter's counsel. I'm sorry to keep interrupting you, but I'm looking at page 824 of your appendix. And it's what's called a first payment letter, which would have been presented to your client on the date of closing. And it calculates what the amount of the payment is, and it shows mortgage insurance 174.39 as part of the payment. So, in other words, I mean, there wouldn't be anything coming out of the closing for mortgage insurance, but then on the same day, he's given a letter that says, when your first payment's due, this is how much you pay, and this is what's included in it. Right? Well, apparently that is, and that's certainly the $1,227.57. In other correspondence, it looks like what they've done is they have dropped out the mortgage insurance. I think we're probably in agreement here that the difference is how much. It's the real estate taxes. It's the real estate taxes that poses the problem. Okay. At page 3 of Penny Mac's brief, they use the word temporarily increase the payment up to 1565. But nowhere, anywhere in this record, which is all exhibits attached to the complaint, has a quarter ever given any assurance at all. There's no statement anywhere indicating that this increase to 1565 is only temporary. And certainly, Porter is never told how long that 1565 is going to be on his shoulders and when it will drop off. Now, I don't see how, and counsel did mention the July 22nd, 2013 letter, but if they're trying to say that they are going to be bound by the rest of the statement, then why is Ms. Breer saying, and I'm going to read it again because it's so important, because what are you going to do if you're advising Mr. Porter at this point? As of the date of this letter, July 22nd, 2013, Mr. Porter's account is currently due for the June 1st, 2013 payment in the amount of $1,565.35 and all subsequent mortgage payments. Okay. And I would never want to be the devil's advocate, but just being the devil's advocate here again. Page 49 and 50 of your appendix, which is the annual escrow account disclosure statement that was sent to him explaining the shortage in the real estate taxes and why they're increasing his payment and all it says, this means you have a shortage of $2,127.65. Per federal law, the shortage may be collected from you over 12 months or more unless it is less than one month's deposit. In which case, we have the additional option of requesting payment within 30 days. And then it says, we will collect the shortage over 12 months. And then it outlines what the new payment is. So what am I supposed to do here, Your Honor? Wouldn't that kind of alert you that that's your payment for 12 months? What am I supposed to do when I get a conflict between what Penny Mac is telling me in writing rather than in finding print? And I agree. Federal law probably only permits them to collect that over 12 months. And certainly, no law allows them to collect $1,565.35 for the 30-year life of the mortgage. And that's what this letter is saying. Thank you, Counsel. We'll take this case under advisement. It's your ruling in due course. I want to keep going.